

## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

#### NO. 02-16-00395-CR

HERBERT HOOVER PRATT III                                      APPELLANT

V.

THE STATE OF TEXAS                                               STATE

----------

### FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1381999D

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

Appellant Herbert Hoover Pratt III was arrested pursuant to a warrant after he answered the front door of his house in response to the police's knock. Police discovered cocaine in his pocket during the post-arrest frisk for weapons and contraband. Pratt was charged with and convicted of possession of a controlled

----

[1]*See* Tex. R. App. P. 47.4.

substance in a quantity of at least 4 grams but less than 200 grams. *See* Tex. Health & Safety Code Ann. § 481.115(d) (West 2017) (second-degree felony drug offense). He pleaded true to the punishment enhancement allegations and was sentenced to forty years' confinement. *See* Tex. Penal Code Ann. § 12.42 (West Supp. 2017) (setting out punishment range for offense enhanced by repeat felonies).

In two issues, Pratt appeals his conviction, complaining that he received ineffective assistance of counsel because his attorney failed to file a motion to suppress the evidence that led to his conviction and that the trial court's order to withdraw funds, which is incorporated into the trial court's judgment, states court costs in the wrong amount. We modify the trial court's order to withdraw funds to accurately reflect the amount of court costs listed in the trial court's judgment and affirm the trial court's judgment as modified.

## II. Ineffective Assistance

In his first issue, Pratt argues that he was denied effective assistance of counsel when his "lawyer failed to suppress the fruits of the search stemming from his arrest on a warrant based on a deficient affidavit." Specifically, Pratt complains that his attorney failed to file a motion to suppress the cocaine based on a deficiency in the arrest warrant affidavit that Pratt discovered and communicated to his attorney during voir dire. In his reply brief, Pratt further clarifies that his complaint "goes to the sufficiency of the arrest warrant affidavit and not [the] warrant itself."

## A. Standard of Review

To establish ineffective assistance of counsel, the appellant must show by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). An ineffective-assistance claim must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307. Review of counsel's representation is highly deferential, and the reviewing court indulges a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

The prejudice prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, the appellant must show there is a reasonable probability that, without the

3

deficient performance, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2070. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S. Ct. at 2069.

To satisfy *Strickland*, an appellant who complains that counsel was ineffective for failing to file a motion to suppress must prove that the motion to suppress would have been granted. *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998).

## B. Totality of Counsel's Representation and the Case's Circumstances

### 1. The Affidavit

The magistrate issued the warrant for Pratt's arrest for "continuous violence against the family," *see* Tex. Penal Code Ann. § 25.11 (West 2011), based on Fort Worth Police Detective A.M. Mapes's June 23, 2014 affidavit. In the affidavit, Detective Mapes stated under oath,

> I have good reason to believe and do believe that on or about the **6th day of June, 2014** in Tarrant County, Texas, [Pratt] . . . did then and there commit the offense of

4

**ASLT BI FAM/HOUSE MEM 2+ W/IN 12 MONTHS §25.11 PC – F3 – 13990071 *Continuous Violence Against the Family*[2]**

During a period of time this is 12 MONTHS OR LESS in duration; did engage in conduct that constitutes ASSAULT BODILY INJURY, specifically: on or about **04/25/2014** did Intentionally or Knowingly cause bodily injury to **Pratt,[ ]Delaina**, A member of the Defendant's Family or Household, and on or about **06/06/2014** did Intentionally or Knowingly **push the Victim to the ground, Straddled her and then began to strike her in the face with his fists causing swelling, redness and pain, also causing bruising and pain to both arms,** who is a member of the Defendant's Family or Household[.]

Detective Mapes then set out the following facts and information:

1. The Victim-Pratt,[ ]Delaina and the Suspect-Pratt,[ ]Herbert[3] are married and live together. [Delaina] and [Pratt] live at the offense location of [Pratt's home address].

2. On 06/06/2014 FWPD Officer[] B Cantu#3847 was dispatched to the Walmart Store located at [6]513 Meadowbrook Dr, Fort Worth, Tarrant County, 76112 to meet with [Delaina] who wanted to report an Assault. Officer Cantu met with [Delaina] who related the following:

3. [Delaina] stated she returned home from the store and when she opened the front door [Pratt] was standing in the entryway. [Pratt] grabbed [Delaina] and threw her on the ground, straddled her as she was lying face up and put his weight with his knees on her two arms preventing her from moving. [Pratt] then punched [Delaina] in the face with his fists causing [Delaina] pain. [Pratt] struck her approximately ten times. While assaulting her he was asking her who she had been out with. [Delaina] was unable to respond because he kept punching her. [Pratt] also used his knees to jump up and down on [Delaina's] arms causing pain, redness and bruising. [Pratt] then grabbed [Delaina] by her throat with both hands and began to squeeze and said, "You don't think I'm going to

---

[2]The same language was used in the arrest warrant.

[3]The affidavit subsequently referred to Delaina as "the Victim" or "VIC" and Pratt as "the suspect" or "SUS."

kill you and kill myself?" [Delaina] said she was not sure if she blacked out. [Pratt] then grabbed [Delaina's] car keys and phone from her pocket when he noticed that the phone was dialing 911. [Pratt] got off of [Delaina] and left the scene. [Delaina] ran outside and was hiding in the bushes as she watched [Pratt] coming back. [Pratt] entered the house and once he went inside [Delaina] [had] the opportunity to run for help. [Delaina] ran to 6513 Meadowbrook Dr. to notify police.

4. Officer Cantu relocated to the offense location [Pratt's address] to locate [Pratt] but he had already fled the scene.

5. Officer Cantu and [Delaina] filled out a family violence packet and [Delaina] requested an EPO. Officer Cantu completed his investigation and generated offense report 14-53176 entitled it Assault Bodily Injury.

6. On 06/09/2014 your affiant was assigned this case for follow-up investigation. Your affiant reviewed the report, statements and [Delaina's] injuries.

7. I ran [Pratt's] criminal history, and found that he was engaged in conduct of family violence on 04/25/2014. He was listed as the suspect of Assault Bodily Injury Family Member on service number 14-38153.

That based on the above information and facts related to her and as a result of her investigation your affiant does believe the suspect . . . did commit the offense of **ASLT BI FAM/HOUSE MEM 2+ W/IN 12 MONTHS §25.11 PC – F3 – 13990071** *Continuous Violence Against the Family*, against the laws of the State of Texas as set forth in the penal code.

## 2. Timeline of Events

According to the evidence presented during Pratt's trial, all of the arrest warrants in the City of Fort Worth go through the Fort Worth Police Department's fugitive office. When officers in the fugitive office receive a warrant, they perform computer-based research on likely locations, names, vehicles, next of kin, and

6

anything else that could make it easier to find the suspect. The fugitive office is notified daily about warrant cancellations, and the officers have a standard procedure to check whether a warrant is still good before trying to execute it.

Pratt's arrest warrant was assigned to Officer David Sullivan, who had acquired the street nickname "RoboCop" in the 1990s when he worked in the police department's narcotics unit.[4] As the lead officer for executing Pratt's arrest warrant, Officer Sullivan was responsible for gathering the resources—research and officers—needed to execute the warrant and to ensure everyone understood his assignment during the warrant's execution. When Officer Sullivan received Pratt's arrest warrant, he spent several days researching where to find Pratt, including watching Pratt's house for a few days, but he did not see Pratt until the day of the arrest.

On August 18, 2014, Officer Sullivan and Officer Martin King watched Pratt's house from separate, unmarked vehicles.[5] Once he saw Pratt, Officer Sullivan contacted the "assist" officers—Officer King and two patrol officers, Salas and Myers. Because he was the lead officer for the warrant, Officer Sullivan knocked on Pratt's front door.

---

[4]Pratt testified that "Officer RoboCop" was a legend in Fort Worth for narcotics busts and fugitive busts.

[5]Officers Sullivan and King each had around thirty years' of law enforcement experience and were assigned all of the warrants for the east side of the city.

When Pratt answered the front door, Officer Sullivan informed him that there was a warrant for his arrest. Pratt was arrested on the warrant, handcuffed, and escorted to a marked patrol vehicle, but prior to placing him in the vehicle, the officers searched Pratt for weapons and contraband. Officer Sullivan testified that when he searched Pratt, he found three plastic baggies containing what appeared to be drugs in Pratt's front-right pants pocket. Two of the baggies contained what appeared to be crack cocaine, while the third contained a powder.[6] One of the baggies contained more baggies, and Officer Sullivan testified that he believed that the significance of possessing three individual baggies, each containing what he suspected was cocaine, was that the drugs had been divided up for sale rather than for personal use.

At trial, Pratt claimed that he had been wearing shorts, not pants, denied that he had had drugs in his pocket, and accused the police of planting the drugs on him. He testified that he overheard the police talking after they put him in the back seat of the patrol car and that one of them had laughed and said, "I can't believe this guy would actually have this on him, what - - what is he thinking, he has to be the dumbest criminal alive." Pratt said that, in light of the fact that one of the officers had planted the drugs on him, "it felt as though they were mocking [him] or trying to make fun of [him]."

---

[6]A Fort Worth Police Department crime laboratory forensic scientist testified that the three baggies contained 5.457 grams, 6.747 grams, and 4.189 grams of cocaine, respectively, for a total of 16.393 grams.

8

The original complaint against Pratt was filed on August 20, 2014, two days after his arrest, and set out a single charge of drug possession in the amount of at least four grams but less than 200 grams, with a repeat offender notice of a 2009 felony conviction for drug possession in the amount of at least four grams but less than 200 grams. Pratt was subsequently indicted in October 2014 both for possession and for possession with the intent to deliver, and his indictment included a habitual offender notice alleging that he had been convicted of felony drug possession in 2009 and of a burglary of a habitation (another felony) in 2002. Over the course of his case, the State offered Pratt more than one plea bargain for the minimum sentence under the enhanced punishment range of twenty-five years to life.

After his first retained counsel and later his second retained counsel withdrew, on March 16, 2015, the trial court appointed Pratt's trial counsel, who was already "representing [Pratt] in a related matter." On June 27, 2016, Pratt's counsel moved for the appointment of an investigator, and the trial court granted the motion.[7] At some point, the State waived the possession count, which was instead included as a lesser-included offense in the jury charge.

---

[7]In July 2016, Pratt sent the trial court a pro se document, declaring that he and his counsel had a conflict and seeking appointment of new counsel. In this document, Pratt complained that his trial counsel and the State had deprived him of presenting "crucial evidence" that would exonerate him. He wanted to subpoena Delaina's phone records, although his counsel had advised him that it was unnecessary. Pratt also complained that his counsel had not filed any of the motions he asked for during their two visits, including his request for an investigator during their June 11 meeting. (Pratt was apparently unaware at the

9

Jury selection began on October 4, 2016. During trial, Pratt's counsel's theory of the case appeared to be that Pratt had turned his life around when various police officers[8] showed up at his house and arrested him but did not record the arrest via dashboard camera or body camera. He pointed to the lack of evidence to support the intent-to-deliver element, including that none of the officers sought to search Pratt's residence despite a larger-than-average drug seizure from Pratt's person and the presence of another person in the house who could have destroyed evidence.[9] Pratt's counsel also clarified through cross-examination that the police had gathered no evidence that Pratt had made any offers to sell drugs or any deliveries and that there was no distribution-type paraphernalia—such as scales, baggies, or ledgers—on Pratt's person when he was arrested.[10]

---

time that he wrote the document that counsel had actually filed a motion for an investigator and that the trial court had granted the motion at the end of June.)

[8]Pratt's counsel asked Officers Sullivan and King about officers that were listed as having been at the scene of Pratt's arrest, and both officers testified those officers were not actually present.

[9]Officer Sullivan testified that the other person he saw inside Pratt's house was a "young lady" who "said some parting words" to Pratt. Pratt testified that when he was arrested, his girlfriend, Miracle, brought him a cigarette and asked him what she needed to do.

[10]During Officer King's testimony on redirect, he stated that he had no doubt about Pratt's intent to deliver based on the quantity of narcotics, the method of packaging in individual baggies, and the presence of both powder and crack cocaine.

After the State rested, Pratt, who was thirty-four years old at the time, testified about his prior convictions over the past fourteen years.[11] Pratt had been released on parole in mid-2011, reuniting with Delaina, who he said moved out in March 2014. Pratt testified that his last trip to prison had taught him the error of his ways and that while on parole, he opened his own business, HP's Supreme Cleaning, a janitorial service.

Pratt said that when he answered the door to Officer Sullivan's knock, he counted "at least nine cars"—five marked police cars and four unmarked vehicles. When he returned home after posting bond, it appeared to him that his house had been searched, although nothing appeared to have been taken. Pratt claimed that the police had planted the drugs on him because he had "made a mistake by getting a house in a neighborhood, in an area, in which [he] used to do illegal activities." Pratt admitted that he had been "well-known for trafficking" drugs within the two-mile radius of his house from 2005 to around 2009 and suggested that the police might have a "hidden agenda."

---

[11]Pratt was convicted of burglary of a habitation on a guilty plea when he was twenty years old and, after failing to complete probation in that case, was sentenced to five years' confinement for that offense. In 2005, he was convicted of possession of a controlled substance (cocaine) in an amount less than one gram and sentenced to state jail for fifteen months. He pleaded guilty in 2007 to other possession charges involving amounts of less than one gram of cocaine and of ecstasy (methylenedioxy methamphetamine, or MDMA) and pleaded guilty in 2009 to additional possession-of-MDMA and possession-of-cocaine offenses and to an unlawful-carrying-a-weapon offense, for which he was sentenced to three years' confinement.

During closing arguments, the prosecutor argued that Pratt had narrowed the case to a single issue—whether the police planted the cocaine on him—and that if the jury did not agree that the State had presented enough evidence of intent to deliver, then to find Pratt guilty of possession. The prosecutor told the jury to decide who was lying: Officer Sullivan or Pratt.

Pratt's counsel responded that while he did not expect the police officers to testify that they planted the drugs on Pratt, the jury had to consider the whole situation, including that "RoboCop" or one of the other officers at the scene had a motive to do more than just arrest Pratt on a warrant. He argued that it was unreasonable to think that Pratt, who was not new to the criminal justice system, would answer the front door with 16 grams of cocaine in his pocket. He also pointed out that not a single recording was made of the arrest and that the State had not brought any evidence of fingerprints or DNA on the baggies. In rebuttal, the prosecutor returned to arguing the witnesses' credibility, arguing that Pratt had to testify "in order to get his theory, his story, in front of [the jury]."

The jury found Pratt guilty of possession of a controlled substance. Before the sentencing phase, Pratt pleaded true to the convictions alleged in the enhancement allegations and acknowledged that they increased the statutory punishment range to twenty-five years to life. Pratt's counsel asked for the minimum sentence.[12] The prosecutor did not ask for a specific number but

---

[12]Before the prosecutor made his closing argument during the punishment phase, the trial court referenced the jury's deliberations from 4:45 to 6:05 p.m.

12

pointed out that Pratt's claim that the police had planted the drugs on him demonstrated that he had not accepted responsibility for his actions.

Prior to assessing Pratt's sentence, the trial court mused that the jury had spoken and said "no" to Pratt's story but also "no" to the more serious charge of possession with intent to deliver. The trial court stated that it was bound by the jury's verdict that Pratt had lied and observed that "a person who tries to sell a bill of goods to a jury, as found by their verdict, quite frankly, does deserve more punishment than a person who simply showed up for [his] trial, hoped and prayed for the best, and let [his] lawyer do [the] work." The trial court sentenced Pratt to forty years' confinement.

After the trial court pronounced Pratt's sentence, Pratt's trial counsel asked the trial court to include Pratt's handwritten notes in a sealed record for Pratt's appeal. Counsel stated that he had looked at them "throughout the course of trial, because [he had] carried them back and forth." The notes reflect that during trial, Pratt was at times dissatisfied and at other times pleased with his counsel.

the first day and then again from 9:05 a.m. to 1:00 p.m. the next day, observing that

> for a jury to deliberate so long, [Pratt's counsel's] advocacy did not go unnoticed by the 12 factfinders. This is one of the longest verdicts I've ever had as a judge on a drug case, for a jury to think about it carefully, discuss and deliberate and [the] intelligence of your arguments and your questions showed that they did so. So I understand your client's disappointed and you are. But the fact is, I've seen plenty of cases with similar facts that the jury has made a decision in a half hour or less, so . . . I know you're disappointed, did everything you could.

13

In addition to Pratt's suppression request during voir dire, Pratt wrote on October 3, 2016, the day before he waived arraignment and pleaded not guilty, "I don't feel comfortable with going to Trial with you; just don't feel you've been truthful," and "Do you think the Judge would allow me to represent myself or give me a week to seek other counsel?"  But at some point during the trial, Pratt also wrote in his notes, "KNOCK IT OUT THE PARK.  You GOT it . . . ☺  GREAT JOB[.]"

## C.  Analysis

Code of criminal procedure article 38.23 provides that no evidence obtained by an officer in violation of any provisions of the state or federal constitution shall be admitted in evidence against the accused.  *See* Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2018).  Article 38.23 contains an exception to the exclusion of evidence for circumstances under which "the evidence was obtained by a law enforcement officer acting in objective good faith reliance upon a warrant issued by a neutral magistrate based on probable cause."  *Id.* art. 38.23(b).

### 1.  The Parties' Arguments

Pratt states that he has no quibble with the first six paragraphs of the affidavit, which set out the allegations regarding the June 6, 2014 incident.  But he complains that paragraph 7, regarding the April 25, 2014 incident, is sparse "at best," and he argues that the affidavit is therefore insufficient to support probable cause to arrest him for continuous violence against the family because

14

the paragraph offers only the conclusion that Pratt was engaged in family violence on April 25 and that he was listed as a suspect.[13]

If Pratt is correct that (1) the cocaine was inadmissible as evidence because there was no probable cause to support the arrest warrant that led to the search incident to his arrest; (2) that his trial counsel was therefore ineffective because he failed to file a motion to suppress that evidence; and (3) that the motion to suppress would have been granted, then we must reverse the trial court's judgment convicting him of possession.

The State contends that the warrant and affidavit combined to provide the magistrate probable cause to believe that Pratt committed an offense, even if "not the offense specifically named in the warrant." That is, the State argues that a warrant that states one offense, supported by an affidavit that only provides probable cause to support a different, but related offense is sufficient and that, therefore, because Pratt cannot establish that a motion to suppress would have been granted, we must overrule his first issue.

### 2. Authorities

Pratt refers us to *Bell v. State*, 169 S.W.3d 384, 390 (Tex. App.—Fort Worth 2005, pet. ref'd), in which we set out the following:

---

[13]Although Pratt complains that paragraph 7 offers no information about who the alleged victim was and how he or she was related to Pratt, Detective Mapes stated in the introduction on the first page of the affidavit that Delaina was the complainant in both offenses. Detective Mapes also stated that Delaina and Pratt were married and lived together.

- An affidavit supporting an arrest warrant "must provide the magistrate with sufficient information to support an independent judgment that probable cause exists to believe that the accused has committed an offense," and mere conclusions in the affidavit are not sufficient. *Id.* (quoting *Ware v. State*, 724 S.W.2d 38, 39–40 (Tex. Crim. App. 1986).

- For an arrest to be justified under the Fourth Amendment, there must be probable cause to believe that a person has engaged in or is engaging in criminal activity. *Id.* (citing *State v. Ballman*, 157 S.W.3d 65, 68 (Tex. App.— Fort Worth 2004, pet. ref'd)).

- The court must apply a deferential standard when reviewing the propriety of an arrest with a warrant, looking to the "totality of the circumstances" regarding the information contained in the affidavit, but the review is limited to examining the affidavit's four corners to determine whether probable cause exists. *Id.* (citing *Swearingen v. State*, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004); *Davis v. State*, 144 S.W.3d 192, 196–97 (Tex. App.—Fort Worth 2004, pet. ref'd) (op. on reh'g)).

An affidavit must also be interpreted in a common sense and realistic manner, recognizing that the magistrate is permitted to draw reasonable inferences. *Davis v. State*, 202 S.W.3d 149, 154 (Tex. Crim. App. 2006).

The State refers us to code of criminal procedure article 15.02, entitled, "Requisites of warrant," which requires, in pertinent part,[14] that the warrant "state that the person is accused of *some* offense against the laws of the State, *naming*

---

[14]The other requisites of a warrant are that it must issue in the name of "The State of Texas"; must specify the name of the person whose arrest is ordered or, if the name is unknown, provide a reasonably definite description of that individual; and must be signed by the magistrate, with the magistrate's office named in the body of the warrant or in connection with his or her signature. Tex. Code Crim. Proc. Ann. art. 15.02. Not all of article 15.02's requirements have to be complied with for an officer to rely on a warrant in objective good faith. *See Dunn v. State*, 951 S.W.2d 478, 479 (Tex. Crim. App. 1997) (holding that the warrant had issued even without the magistrate's signature for purposes of the good faith exception under code of criminal procedure article 38.23).

*the offense.*" Tex. Code Crim. Proc. Ann. art. 15.02(2) (West 2015) (emphasis added). A magistrate may issue an arrest warrant "[w]hen any person shall make oath before the magistrate that another has committed *some* offense against the laws of the State." *Id.* art. 15.03(a)(2) (West 2015) (emphasis added).

We have held that the requisites of article 15.02 are satisfied as long as there is sufficient information to provide the arrestee with notice of the offense of which he is accused, even if the arrest warrant itself does not correctly name the offense for which probable cause was established in the affidavit. *Woods v. State*, 14 S.W.3d 445, 449 (Tex. App.—Fort Worth 2000, no pet.).[15] In *Woods*, this court held that "[t]he purpose of requiring the State to specifically name the offense for which a person is to be arrested is to provide the defendant with notice of the offense for which he is charged." *Id.* In that case, during a police interview after being Mirandized, Woods admitted that he had burglarized a home, and the affidavit sponsoring the application for a warrant presented to the

---

[15]Other cases have likewise held the same. *See Jones v. State*, 568 S.W.2d 847, 853–54 (Tex. Crim. App.) (holding that an arrest warrant's naming of the offense as "A FELONY: AG. ROB. SER. INJ." provided sufficient notice), *cert. denied*, 439 U.S. 959 (1978); *see also Owen v. State*, 125 S.W. 405, 406, 408–09 (Tex. Crim. App. 1910) (holding that arrest warrant for "unlawfully whipping a child," issued pursuant to an affidavit alleging assault on a minor, was sufficient but reversing conviction on other grounds); *State v. Smith*, Nos. 03-07-00271-CR, 03-07-00272-CR, 03-07-00273-CR, 2008 WL 341547, at *1 (Tex. App.—Austin Feb. 7, 2008, no pet.) (mem. op., not designated for publication) (noting that while the warrant did not specify the offense for which Smith was to be arrested, the supporting affidavit accused him of possessing chemicals with intent to manufacture methamphetamine).

magistrate stated that Woods had confessed that he had stolen a VCR and Sega video game from the home.[16]  *Id.* at 448.

In one of his appellate issues, Woods complained that the arrest warrant was deficient because it did not specifically name the offense for which he was charged at that time—burglary—and that therefore all of the evidence obtained as a result of that arrest was inadmissible.  *Id.* at 449.  We held that the trial court did not err by denying Woods's motion to suppress for two reasons.  First, because the affidavit and warrant were part of a single, two-page document, the affidavit's recitation that Woods had confessed to taking the property and pawning it, its description of the specific property that was stolen, the naming of an eyewitness who saw Woods with the stolen property, and the affidavit's last sentence that included the officer's allegation that Woods "on or about 4-29-97 entered a habitation owned by Schwana Patterson without her consent to commit theft," combined to provide the requisite notice that he was being arrested for entering the woman's home and taking her property without her consent.  *Id.* And second, the record reflected that Woods had been arrested by officers acting in objective good faith reliance upon the warrant, which (as set out above) was based on probable cause and issued by a neutral magistrate.  *Id.*

---

[16]In the course of committing the burglary, Woods had also abducted and brutally assaulted two children who lived in the home, had driven them to a cemetery, and had left one of them there for dead.  Woods was ultimately convicted of attempted capital murder of that child.  *Id.* at 447–48.

### 3. Application

Similar to the facts in *Woods*, here the warrant and affidavit were part of a single, three-page document. Based on this record, while the instant affidavit may not have presented sufficient information to determine probable cause for Pratt's arrest for continuous violence against the family under penal code section 25.11, there was sufficient information—graphic, specific information, as acknowledged by Pratt—in the affidavit attached to the warrant to support probable cause for his arrest for assault-family violence under penal code section 22.01.[17] *Compare* Tex. Penal Code Ann. § 25.11(a), (e) (stating that a person commits continuous violence against the family—a third-degree felony—if, during a period that is 12 months or less in duration, he engages at least twice in conduct that constitutes an offense under section 22.01(a)(1) against a person with whom he has a family or dating relationship), *with id.* § 22.01(a)(1), (b)(2)(B) (West Supp. 2017) (providing that a person commits an assault if he intentionally, knowingly, or recklessly causes bodily injury to another, including his spouse, which is a third-degree felony if committed against a person with whom the defendant has had a family relationship and if the defendant commits it by intentionally, knowingly, or recklessly impeding the victim's breath by applying

---

[17]This offense was also specifically set out in part in the arrest warrant as the "ASLT BI FAM/HOUSE MEM" (assault-bodily injury of a family or household member) portion of "ASLT BI FAM/HOUSE MEM 2+ W/IN 12 MONTHS §25.11 PC – F3 – 13990071 *Continuous Violence Against the Family*."

19

pressure to her throat or neck).[18]   This graphic, specific information that was sufficient to determine probable cause was likewise sufficient to provide notice to Pratt that he was being arrested for assault-family violence.

Furthermore, on this record, there is no indication that the officers who were tasked with enforcing the arrest warrant, which was adequate on its face for an arrest for an assault-family violence-based offense, acted in other than good faith when they arrested Pratt under the warrant's authority.  Applying our holding in *Woods*, the trial court would not have erred by denying a motion to suppress on this ground.  Thus, Pratt's counsel's failure to file such a motion was not ineffective assistance of counsel.  *See Jackson*, 973 S.W.2d at 957 ("[T]he appellant was still obliged to prove that a motion to suppress would have been granted in order to satisfy *Strickland*."); *see also Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("[A] reasonably competent counsel need not perform a useless or futile act . . . .").  We overrule Pratt's first issue.

### III.  Court Costs

The first page of the judgment and the bill of costs identify court costs of $389.  However, Attachment A, the order to withdraw funds incorporated into the judgment, orders the withdrawal of $668 in court costs.  In his second issue, Pratt asks us to correct the amount of court costs listed in the order to withdraw.  The State agrees, and we agree, that the order to withdraw should conform with the

---

[18]Pratt allegedly beat Delaina and then "grabbed [her] by her throat with both hands and began to squeeze."

20

amount listed in the trial court's judgment. Accordingly, we sustain Pratt's second issue and correct the order to withdraw to reflect the $389 amount of court costs listed in the trial court's judgment. *See* Tex. R. App. P. 43.2(b) (providing that the appellate court may modify a trial court's judgment and affirm it as modified); *see also Allen v. State*, 426 S.W.3d 253, 259 (Tex. App.— Texarkana 2013, no pet.) (modifying judgment to reflect assessment supported by bill of costs and affirming modified judgment).

## IV. Conclusion

Having sustained Pratt's second issue, we correct the trial court's order to withdraw to reflect the $389 amount of court costs listed in the judgment. Having overruled Pratt's first issue, we affirm the trial court's judgment as modified.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL: SUDDERTH, C.J.; KERR and PITTMAN, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: May 3, 2018